**In re: LUPRON® MARKETING
AND SALES PRACTICES
LITIGATION**

**Nos. MDL 1430, 01–CV–10861–RGS.**

United States District Court,
D. Massachusetts.

Jan. 24, 2003.

Order Denying Reconsideration
Feb. 19, 2003.

Thomas G. Shapiro, Shapiro, Haber & Urmy, LLP, Boston, MA, Jeffrey Kodroff, Spector & Roseman, Philadelphia, PA, Thomas M. Sobol, Lieff, Cabraser, Heimann & Bernstein, LLP, Boston, MA, for Plaintiff.

Deborah S. Birnbach, Joseph F. Savage, Testa, Hurwitz & Thibeault, LLP, Boston, MA, Daniel A. Curto, McDermott, Will & Emery, Martin F. Murphy, Rheba Rutkowski, Fiona S. Trevelyan, Bingham McCutchen LLP, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON DEFENDANT TAKEDA'S MOTION TO DISMISS FOR WANT OF PERSONAL JURISDICTION

STEARNS, District Judge.

A consortium of patients and health care plans maintains that defendants Abbott Laboratories ("Abbott"), Takeda Chemical Industries, Ltd. ("Takeda") and TAP Pharmaceutical Products, Inc. ("TAP") (an Illinois corporation owned by Abbott and Takeda) conspired to artificially inflate the price for the cancer drug Lupron®.[1] The plaintiffs' consolidated class action is grounded on the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.[2] It seeks to recover the alleged overcharges for Lupron® and to impose a treble measure of punitive damages. Defendants deny the conspiracy allegations, question the legal theories on which the RICO claims are based, and, in the case of Takeda, challenge the existence of jurisdiction in the courts of the United States. Consistent with the rule that a trial court should determine whether Article III jurisdiction exists before proceeding to the merits of a claim, the court will in this decision address Takeda's jurisdictional arguments. *See Steel Co. v. Citizens for a Better Environment,* 523 U.S. 83, 95–103, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).

## BACKGROUND

Abbott is a major manufacturer and distributor of prescription drugs. With headquarters in Abbott Park, Illinois, Abbott employs some 60,000 people. It reported sales of $13.7 billion during its fiscal year 2000. Takeda, based in Osaka, Japan, is Japan's largest pharmaceutical company. Takeda reported worldwide sales in 1999 of $8.7 billion. Takeda manufactures Lupron® in Japan for export to the United States. TAP is an Illinois-based corporation jointly owned by Takeda America Holdings ("TAH")[3] and Abbott. Lupron® is distributed in the United States by TAP

---

1. As indicated by the caption of the case, the lawsuit consists of nine aspiring class actions filed in federal district courts in Illinois, Massachusetts, Alabama, and Minnesota. The class action cases were consolidated in this court by the Multi–District Litigation Panel ("MDLP"). A coalition of Blue Cross and Blue Shield Plans, which filed two Lupron®-related non-class action cases in the District of Massachusetts has agreed to coordinate pretrial proceedings with the class action plaintiffs, as has the late-arriving non-class action plaintiff Cobalt Corporation. (On December 20, 2002, Cobalt withdrew its opposition to the instant motion to dismiss).

2. Plaintiffs also assert claims under state consumer protection statutes, as well as claims of common-law fraud and unjust enrichment.

3. TAH is a wholly owned Takeda subsidiary. TAH has a corporate existence apart from Takeda, and plaintiffs do not contend otherwise. Takeda has two other North American presences—Takeda Pharmaceuticals North America, Inc. ("TPNA"), a subsidiary of TAH, and Takeda Pharmaceuticals America, Inc. ("TPA"), a subsidiary of TPNA. The latter are Delaware corporations with principal places of business in Lincolnshire, Illinois. Neither is involved in the production or marketing of Lupron®, but are vehicles for the distribution

though a subsidiary, TAP Pharmaceuticals, Inc. Plaintiffs concede that TAP is a "separate and distinct" entity in the sense that it "maintains its own employees and operations and conducts its affairs separately from Abbott and Takeda." Corrected Consolidated Amended Class Action Complaint ("Amended Class Action Complaint") ¶ 61. TAP's corporate headquarters are in Waukegan, Illinois.

Lupron® (leuprolide acetate), which acts to suppress the human hormone testosterone, is used primarily in the treatment of male prostrate cancer. It is also effective in treating endometriosis, central precocious puberty, and uterine fibroid preoperative anemia. Lupron® is administered by intramuscular injection, typically in the arm or buttocks, in daily or monthly doses. Consequently, most Lupron® is sold to doctors who administer their patients' injections.

On October 13, 2001, the U.S. Attorney for the District of Massachusetts announced that TAP had agreed to pay $875 million to settle criminal charges and civil claims arising from the fraudulent marketing of Lupron®.[4] The primary victim identified in the criminal information filed against TAP was the U.S. Department of Health and Human Services ("HHS")

Medicare program. Medicare was created in 1965 by Congress as an extension of the Social Security Act. Medicare reimburses the costs of a number of medical services, including the costs of certain prescription drugs, for enrolled recipients. Beneficiaries are not, as a rule, reimbursed for the costs of self-administered drugs. However, Medicare Part B pays providers 80% of the allowable cost of an injectable drug like Lupron®.[5]

"Allowable cost" was defined by HHS regulations until 1998 as the lesser of either a drug's estimated acquisition cost or its national average wholesale price ("AWP").[6] 42 C.F.R. § 405.517. Medicare administrators historically relied on the AWP provided by TAP to the *Red Book*, an industry compilation of wholesale drug prices, in setting the reimbursement rate for Lupron®.[7] The *Red Book* AWP for Lupron® in 1992 was $418.75— $437.50; in 1993 $437.50; in 1994 $463.75; in 1995 $477.50; in 1996 $496.25–$515.63; in 1997 $515.63; in 1998 $540.63; in 1999 $594.65; in 2000 $623.70; and in 2001 $623.79.[8] In pleading guilty to violating the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), TAP admitted to encouraging doctors to bill Medi-

of other Takeda pharmaceutical and vitamins products.

4. TAP paid a criminal fine of $290 million and $559,483,560 in restitution to the U.S. Government for the filing of fraudulent Medicare claims. TAP paid an additional $25,516,440 in restitution to the fifty States and the District of Columbia for fraudulent Medicaid filings.

5. The remaining 20% is paid by the Medicare beneficiary as a "co-payment." In addition, beneficiaries under Part B are required to pay an annual deductible before Part B benefits become available. Some Medicare participants purchase private insurance to cover all or part of the co-payment.

6. On January 1, 1998, 42 C.F.R. § 405.517, was amended to redefine the allowable cost as the lower of the actual Medicare billing claim or 95% of the AWP.

7. The *Red Book* publishers simply compile wholesale prices reported by drug manufacturers. No independent verification of a drug's actual sales price is undertaken by the *Red Book* or any other industry source.

8. Despite the published AWPs, according to the Amended Class Action Complaint, the actual average cost of Lupron® to doctors who purchased the drug from TAP decreased from $340.00 in 1993 to $207.00 in 1999. *Id.* at ¶ 8.

care at the *Red Book* AWP for free samples of Lupron® as part of a scheme to promote "brand loyalty" by permitting doctors to pad their incomes by pocketing the AWP reimbursement.[9] "TAP knew that [it] could 'raise' the average wholesale price of Lupron at any time by simply forwarding to the *Redbook* a new and higher average wholesale price. This allowed TAP, in effect, to control the maximum Medicare reimbursement paid to a doctor for [prescribing] Lupron." Government's Sentencing Memorandum, at 12. The Memorandum further acknowledged that the proposed settlement did not include restitution for private insurers and co-paying patients who had also been victimized by the scheme, but noted that "some patients and health insurers have commenced litigation against TAP to recover overpayments caused by the criminal conduct and thus have a forum in which to demonstrate and obtain any appropriate damages." *Id.* at 4.

Plaintiffs are among the health care providers and individual consumers who purchased (or reimbursed the purchase) of Lupron® at the inflated AWP. Nine of the cases transferred to this court by the MDLP for pretrial proceedings were filed as putative class actions in federal courts in Illinois, Massachusetts, Alabama, and Minnesota. For convenience, each will be referred to by the name of the lead plaintiff.[10] The direct action filed in Massachusetts by the Blue Cross and Blue Shield Plans will be referred to as the Blues Complaint.[11]

## THE AMENDED CLASS ACTION COMPLAINT

The essential facts set out in the Amended Class Action Complaint are as follows.[12] According to plaintiffs, the AWPs for Lupron® reported by the defendants to the publishers of the *Red Book* bore no resemblance to the actual prices charged by TAP to doctors, nor did they

9. Following TAP's plea, indictments were unsealed against six present and former TAP executives and one Massachusetts urologist, alleging a criminal conspiracy to defraud Medicare. Several other urologists pled guilty to criminal informations. In a side letter presented at the TAP plea hearing, Takeda agreed to cooperate with the government's ongoing grand jury investigation and, as a shareholder in TAP, to insure TAP's compliance with the obligations imposed by the plea agreement.

10. The nine cases are: *Townsend v. TAP Pharmaceutical Products, Inc.* (N.D.Ill.C.A. No. 01–4435); *Russano v. TAP Pharmaceutical Products, Inc.* (N.D.Ill.C.A. No. 01–6982); *Goetting v. TAP Pharmaceutical Products, Inc.* (S.D.Ill.C.A. No. 01–703); *Porter v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 01–10861); *Beacon Health Plans, Inc. v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 01–10897); *Maczak v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 01–11053); *Mechanical Contractors–UA Local 119 Welfare Plan v. TAP Pharmaceutical Products, Inc.* (D.Mass.C.A. No. 02–10238); *Brick-*

ey v. TAP Pharmaceutical Products, Inc. (N.D.Ala.C.A.No.01–2770); and *Twin Cities Bakery Workers Health and Welfare Fund v. TAP Pharmaceutical Products, Inc.* (D.Minn. C.A. No. 01–2023).

11. The Blues cases are *Empire Healthchoice, Inc., d/b/a/ Empire Blue Cross and Blue Shield v. TAP Pharmaceutical Products, Inc.* (D.Mass.02–10015); and *Blue Cross and Blue Shield of Florida, Inc. v. TAP Pharmaceutical Products, Inc.* (D.Mass.02–10139). On January 14, 2003, the court approved a stipulation adding Oxford Health Plans, Inc., and Horizon Healthcare Services, Inc., to the Blues Consolidated Complaint.

12. I have focused on the Amended Class Action Complaint as the Blues Complaint largely echos its allegations, albeit with somewhat richer detail. Where appropriate, facts set out in the Blues Complaint that enlarge on the Amended Class Action Complaint are incorporated in the synopsis. The term "plaintiffs" is meant to apply to both the class action complainants and the Blues plaintiffs.

bear any relationship to a reasonable interpretation of the terms "average" or "wholesale." The AWPs were rather pegged at a grossly inflated level to permit doctors to inflate their incomes by billing co-paying patients for 20% of the AWP or by claiming an AWP reimbursement rate from Medicare for the "free" samples distributed by TAP sales representatives.[13] According to TAP's own records, TAP sales representatives gave away some $31 million in "free" Lupron® samples between 1993 and 1999 as measured by the published AWP.[14] In pleading guilty to charges that TAP conspired with medical providers to falsely bill Medicare for these samples, TAP's president, Thomas Watkins, admitted

> that TAP provided free samples of Lupron® to a number of physicians, primarily in the early to mid–1990s, with the knowledge that those physicians would seek and receive reimbursement. The billing for free samples is wrong, and it should never have happened.

Amended Class Action Complaint ¶ 83. Dr. Joel Olstein, a urologist in Lewiston, Maine, testified that TAP gave him a free sample of Lupron for every patient that he started on the drug. "They wanted me to carefully track how many new patients I started on Lupron® and we kept lists. Anybody in practice knows how to bill for free samples."[15] *Id.* at ¶ 95.

Plaintiffs allege that defendants offered other undisclosed financial inducements to medical providers to stimulate the sales of Lupron®, including volume discounts, rebates, purported "education" grants, junkets, off-invoice pricing, free goods, credit memos, consulting fees and debt forgiveness. In August of 1995, physicians were offered a 2% rebate on all Lupron® purchases. In 1996, the Tufts Health Maintenance Organization decided to switch its prostate cancer patients from Lupron® to a less costly competitor drug, Zoladex®. In response, TAP's national accounts manager, Janice Swirski, told Tufts that TAP could not make any further reduction in the price charged to Tufts, as that would affect the price TAP charged the federal government for Lupron®.[16] Instead, TAP offered Tufts unrestricted "educational grants" of up to $25,000 per year if Tufts would continue to prescribe Lupron® to its patients.[17]

The Amended Class Action Complaint also contends that the "TAP into the Future" program was a Potemkin facade concealing kickbacks to doctors in the form of expense-paid stays in luxurious settings. These junkets were labeled as "educational" programs, with the attending physicians thinly disguised as "consultants." TAP spent more than $1 million on the "TAP into the Future" program.

Another form of alleged illegal discounting consisted of the forgiveness of debt. To encourage doctors to continue to order Lupron®, defendants would forgive amounts owed for prior purchases. One

---

**13.** According to the Government's Sentencing Memorandum, between 1991 and 1998, 8,443 to 14,703 urologists annually submitted reimbursement claims for Lupron® to Medicare. Some 25% of these urologists received approximately 80% of Medicare's total Lupron® disbursement.

**14.** Because of deficiencies in TAP's record keeping system, the United States Attorney estimated that the true AWP value of the free samples distributed by TAP ranged between $60 million and $90 million.

**15.** Dr. Olstein subsequently pled guilty to a criminal information.

**16.** Swirski is one of the indicted TAP executives.

**17.** Tufts ultimately filed a False Claims Act complaint against TAP.

urology practice in Boston had $11,000 of prior Lupron® debt cancelled in exchange for switching all of its patients from Zoladex® to Lupron®. In 1995, Kimberlee Chase, a TAP sales representative discharged $13,000 of Lupron® debt owed by a urology practice in Fall River, Massachusetts, when the group (which owed TAP in excess of $70,000) threatened to switch its patients from Lupron® to Zoladex®.[18]

Under the guise of business review meetings, TAP devised a so-called "Return to Practice" program to demonstrate how doctors could profit from the "spread" between the AWP for Lupron® and the actual price that they would be charged for the drug. In one case, a TAP employee left a spread sheet with a Massachusetts urologist who had switched to the less costly Zoladex® showing an additional profit of $7,000 that the doctor could earn by milking the AWP for Lupron®. On another occasion, TAP executives increased the AWP for Lupron® to counter an announced rise in the AWP for Zoladex®.

TAP sales representatives routinely counseled doctors to conceal from patients, insurance carriers, Medicare, and even other doctors, the actual price that they paid for Lupron®. According to the criminal information, Alan Mackenzie, a senior TAP marketing executive, instructed his sales force to caution doctors "that if [they] disclosed their invoice costs to the Medicare Program, that Program would take steps to reduce the maximum payment allowed for Lupron® and thus reduce [their] profit for Return to Practice." He further told his sales people to warn

doctors that "by discussing your costs of Lupron® with other physicians, you run the risk of that information getting back to [HHS]. If [HHS] then realizes that AWP is not a true reflection of the price, the AWP could be affected, thus lowering the amounts you may charge."[19] Amended Class Action Complaint at ¶ 112. The only pricing information for Lupron® that TAP publicly disclosed was the inflated AWP.

## DISCUSSION

### The Standard of Review

When reviewing a motion to dismiss, "[w]e must accept the allegations of the complaint as true, and if, under any theory, the allegations are sufficient to state a cause of action in accordance with the law, we must deny the motion to dismiss." *Vartanian v. Monsanto Company*, 14 F.3d 697, 700 (1st Cir.1994).

### Insufficient Service

Takeda contends that five of the nine separate class action lawsuits should be dismissed for insufficiency of service.[20] Takeda agrees that four of the actions (*Porter, Beacon, Russano*, and *Brickey*) were served in accordance with the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"). In the remaining cases (*Maczak, Goetting, Twin Cities, Townsend*, and *Mechanical Contractors*), plaintiffs simply mailed Takeda's counsel a copy of the Amended Class Action Complaint. Takeda argues (correctly) that these attempts to circumvent the formalities of the Hague

---

**18.** Chase was subsequently indicted.

**19.** Mackenzie was subsequently indicted.

**20.** While this argument was originally directed at six of the plaintiffs, Takeda concedes that the plaintiff in *Brickey* (Alabama) has since perfected service under the Convention.

(On January 22, 2003, the court allowed a motion to substitute Christeen Brickey as the lead plaintiff in the *Brickey* action in her capacity as the executrix of the estate of her late husband William Brickey, who died on July 20, 2002).

Convention are defective as a matter of law.[21] At the September 25, 2002 hearing on the motion to dismiss, the court granted the nonconforming plaintiffs ninety additional days to perfect service on Takeda under the Hague Convention.[22]

### Personal Jurisdiction

 Apart from the deficient service of process, Takeda argues that the court lacks personal jurisdiction pursuant to Rule 12(b)(2). It is axiomatic that a court acting without jurisdiction lacks the power to require a party to obey its decrees. *Burnham v. Superior Court*, 495 U.S. 604, 608–609, 110 S.Ct. 2105, 109 L.Ed.2d 631 (1990). A federal district court has no inherent authority to assert jurisdiction over a foreign defendant. It must instead look to a federal statute for the grant of such authority, or it must "borrow" the long-arm statute of the state in which it sits.[23] *See* Fed.R.Civ.P. 4(k)(1). In a narrow class of "federal question" cases, the jurisdictional reach of the court is extended by Rule 4(k)(2), "which functions as a sort of federal long-arm statute." *United States v. Swiss American Bank, Ltd.*, 191 F.3d 30, 36 (1st Cir.1999) (*Swiss Bank I* ).

 *In personam* jurisdiction "is of two varieties, general and specific. Gener-

al personal jurisdiction ... is the power of a forum-based court ... 'which may be asserted in connection with suits not directly founded on [that defendant's] forum-based conduct ....'" *Donatelli v. National Hockey League*, 893 F.2d 459, 462–463 (1st Cir.1990). "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1083–1084, 1091 (1st Cir. 1992) (*Pleasant Street I* ). *See also Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir.1994). The test for general jurisdiction might fairly be described as one gauging the intensity and duration of the contacts between a nonresident defendant and the forum State. *See Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir.1987) ("When the cause of action does not arise from or relate to the foreign corporation's purposeful conduct within the forum state, due process requires that there be *continuous and systematic contacts* between the State and the foreign corporation to support an exercise of 'general' personal jurisdiction by that forum.... More contact is required with the forum state because the

---

**21.** Takeda points out that plaintiffs in three of the actions (*Maczak, Townsend*, and *Mechanical Contractors)*, are not named as parties in the Amended Class Action Complaint.

**22.** While the court has not received notice that service is now complete, the court will assume that it is, and will release this opinion (the ninety days now having expired) without prejudice to Takeda's right to renew its motion with respect to any plaintiff who has not perfected Hague Convention service during the additional time allotted by the court.

**23.** While plaintiffs assert that personal jurisdiction is properly based on the federal RICO statute, Takeda argues that RICO authorizes nationwide, rather than worldwide, service of

process, and that it is immune from effective service in the United States. *See Stauffacher v. Bennett*, 969 F.2d 455, 460–461 (7th Cir. 1992). *But see Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 941 (7th Cir.2000) (holding extraterritorial service proper under ERISA [and RICO] under the [then] newly enacted Rule 4(k)(2) "as long as the Rule's conditions are satisfied and no other statute prohibits jurisdiction or indicates that jurisdiction would be improper."). While Takeda is subject to service under the Hague Convention, service under the Convention does not establish *in personam* jurisdiction. *Doe v. Unocal Corp.*, 27 F.Supp.2d 1174, 1182–1184 (C.D.Cal.1998), *aff'd*, 248 F.3d 915 (9th Cir.2001).

state has no direct interest in the cause of action."). In assessing a claim of general jurisdiction, courts look to factors like instate ownership of property, a license to do business within the state, the payment of state taxes, the instate presence of corporate offices, officers, and employees, contracts signed with state residents, and the volume of business regularly transacted and solicited in the forum State. *United States v. Swiss American Bank, Ltd.*, 274 F.3d 610, 619–620 (1st Cir.2001) *(Swiss Bank II)*. Compare *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 416, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (contract negotiations in Texas, purchases of helicopters and parts, crew training, and the deposit of checks in a Houston bank were insufficient to establish general jurisdiction). " 'Specific personal jurisdiction, by contrast, is narrower in scope and may only be relied upon "where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts." ' " *Pritzker*, 42 F.3d at 60.

While jurisdictional doctrine, complicated as it is by the interplay of overlapping state and federal sovereignties, is a subject of hellish complexity, its constitutional requisites are reasonably clear. "The constitutional inquiry proceeds in three steps: relatedness, purposeful availment, and reasonableness." *Swiss Bank I*, 191 F.3d at 36. At the first step, the court must determine whether a plaintiff's claim is reasonably related to or arises out of the defendant's conduct within the forum State (or, in the case of general jurisdiction, whether the defendant's contacts with the forum State are so pervasive that the court may exercise *in personam* jurisdiction even in the absence of such relatedness). *Id.* at 36 n. 3. The court must next determine whether the defendant's conduct amounts to a purposeful availment of the privileges and protections of the laws of the forum State "such that he should rea-

sonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). *See also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) ("The 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts ..., or of the 'unilateral activity of another party or third person ....' "). Finally, if it is decided that the defendant has the necessary minimum of purposeful contacts with the forum State, the court must consider "whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice.' " *Id.* at 476, 105 S.Ct. 2174.

A plaintiff bears the burden of proving the existence of personal jurisdiction. *U.S.S. Yachts, Inc. v. Ocean Yachts, Inc.*, 894 F.2d 9, 11 (1st Cir.1990). The burden is not, as a rule, a heavy one. When proceeding without an evidentiary hearing, as here, a court deciding a motion to dismiss under Rule 12(b)(2) applies a *prima facie* standard of review to the facts as they are developed by the plaintiff. *United Elec., Radio & Mach. Workers of Am. v. 163 Pleasant Street Corp.*, 987 F.2d 39, 44 (1st Cir.1993) *(Pleasant Street II )*. While the " 'plaintiff must go beyond the pleadings and make affirmative proof' " of the essential jurisdictional facts, *Boit v. Gar–Tec Products, Inc.*, 967 F.2d 671, 675 (1st Cir.1992), quoting *Chlebda v. H.E. Fortna & Brother, Inc.*, 609 F.2d 1022, 1024 (1st Cir.1979), the court "does not act as a factfinder; to the contrary, it ascertains only whether the facts duly proffered, fully credited, support the exercise of personal jurisdiction." *Rodriguez v. Fullerton Tires Corp.*, 115 F.3d 81, 84 (1st Cir.1997). The court may also "add to the mix facts put forward by the defendants,

to the extent that they are uncontradicted." *Mass. School of Law at Andover v. American Bar Ass'n,* 142 F.3d 26, 34 (1st Cir.1998).

### Jurisdictional Facts

The jurisdictional facts asserted by plaintiffs focus primarily on the relationship between Takeda and TAP, emphasizing Takeda's ownership interest in TAP and its involvement in the management of TAP's business. A second, although less developed theme, involves the "regular and systematic contact" between Takeda and Abbott arising from their joint ownership of TAP. Plaintiffs point out that Takeda appoints half of TAP's board of directors, that the president of TAP reports directly to the presidents of Takeda and Abbott, and that Takeda executives have on occasion filled senior positions at TAP. Plaintiffs maintain that Takeda and Abbott approved TAP's annual budget and the hiring of TAP sales representatives. Takeda representatives travel regularly to Illinois (where TAP, Abbott, TPNA, and TPA are based) to review TAP's Annual Plan and to coordinate research and development efforts. TAP generates substantial income and pays regular dividends to TAH for Takeda's benefit. TAP also makes royalty payments to Takeda on the sales of Lupron®.[24] Perhaps more relevant, Takeda is alleged to have received daily reports on TAP's Lupron® sales and to have been fully conversant with (and assisted the development of) TAP's Lupron® marketing strategy.

Many of the jurisdictional facts on which Takeda relies in support of its motion to dismiss are undisputed. Takeda is organized under the laws of Japan and conducts its manufacturing operations exclusively in Japan. Takeda's stock is listed only on Japanese stock exchanges. Takeda has no office or address in the United States and no designated agent for service of process. It owns no real estate in the United States, is not registered to do business in any state, pays no state taxes, and conducts no business in the United States under its own name. Takeda exports Lupron® from Japan to subsidiaries in the United States, principally TAP. Lupron® is marketed and sold in the United States by TAP. TAP is a corporation jointly owned by Abbott and TAH, a non-party Takeda holding company incorporated in Delaware. TAH is not involved in the marketing or sale of Lupron®.

### Illinois Jurisdiction

A transferee court confronted with a jurisdictional challenge ordinarily looks to the law of the state in which the case was initially filed to determine whether jurisdiction exists under the state's long-arm statute. *Doering ex rel. Barrett v. Copper Mountain, Inc.,* 259 F.3d 1202, 1209 (10th Cir.2001). The cases that have been consolidated in this court were originally filed in Illinois, Massachusetts, Alabama and Minnesota. Plaintiffs make their principal argument with respect to Illinois (the home of TAP and Takeda's North American affiliates). Plaintiffs claim that Takeda is subject to both specific and general jurisdiction under the Illinois long-arm statute, 735 Ill. Comp. Stat. § 5/2–209.[25]

The Illinois long-arm statute resembles those of most states in asserting specific jurisdiction over a nonresident defendant who directly or though an agent transacts

---

**24.** While the exact figures are not public, plaintiffs cite TAP sales plans suggesting payments to Takeda over a four year period ranging from $43 million to $90 million. Takeda does not dispute the figures.

**25.** Three of the underlying actions, *Goetting, Russano,* and *Townsend* were originally filed in Illinois.

business within Illinois, commits a tortious act within Illinois, or makes or performs a contract "substantially connected with this State." § 209(a)(1)(2) & (7). The cause of action, however, must arise directly from the enumerated act for jurisdiction to attach under subsection (a). § 209(f). The Illinois long-arm statute also authorizes general jurisdiction in any action "arising within or without this State" involving a defendant who is "doing business within this State." § 209(b)(4). Finally, the statute contains a catch-all clause, authorizing jurisdiction "on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." § 209(c).

Plaintiffs' specific jurisdiction argument relies in the first instance on principles of agency and corporate veil-piercing. More specifically, plaintiffs maintain that the conduct of TAP is imputable to Takeda as TAP operates as Takeda's agent in Illinois under the corporate alter-ego doctrine. "[P]laintiffs contend ... that Takeda's operating ventures in Illinois, while separately incorporated and observing the formalities of corporate 'separateness,' appear to be little more than divisions or departments of a vertically integrated global enterprise that is dominated and controlled in every material respect by Takeda in and from Japan." Opposition to Takeda's Motion to Dismiss, at 35.[26] Alternatively, plaintiffs argue that specific jurisdiction over Takeda is proper under § 209(a), because Takeda "falls squarely" within a conspiracy theory of jurisdiction recognized by Illinois law.

■ There is a longstanding common-law presumption that a separately incorporated subsidiary is institutionally independent of its parent and that jurisdiction

cannot therefore be asserted over a parent based solely on the conduct of the subsidiary. *See, e.g., Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 336, 45 S.Ct. 250, 69 L.Ed. 634 (1925). This "strong" presumption of corporate independence may only be overcome by "clear evidence" of parental subjugation. *Escude Cruz v. Ortho Pharmaceutical Corp.*, 619 F.2d 902, 905 (1st Cir.1980). The "clear evidence" rule requires a showing of something more than the normal badges of ownership "such as monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures," *United States v. Bestfoods*, 524 U.S. 51, 72, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998), or the sharing of directors, officers and employees. *Pleasant Street I*, 960 F.2d at 1083–1084, 1091.

In those cases where personal jurisdiction over the parent has been found to exist, there is invariably a "plus" factor—something beyond the subsidiary's mere presence within the bosom of the corporate family. Sometimes, the parent has utilized the subsidiary in such a way that an agency relationship between the two corporations can be perceived—and that is enough. *See, e.g., Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 420 (9th Cir.1977); *Milligan v. Anderson*, 522 F.2d 1202, 1205–07 (10th Cir.1975); *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483, 492 (5th Cir.1974); *Marsh v. Kitchen*, 480 F.2d 1270, 1272–73 (2d Cir.1973); *see also* 4 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1069, at 364–66 (1987) (listing cases). On other occasions, jurisdiction has been premised on a finding of con-

---

**26.** While TAP is the principal target of this argument, plaintiffs also fold TPA and TPNA into the mix, although no facts have been proffered to dispute Takeda's claim that neither TPA nor TPNA is involved in the marketing or sale of Lupron®.

trol—not merely the degree of control innately inherent in the family relationship, but the exercise of control by the parent "greater than that normally associated with common ownership and directorship." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir. 1983); *see, e.g., Product Promotions*, 495 F.2d at 493; *cf. Mangual v. General Battery Corp.*, 710 F.2d 15, 21 (1st Cir.1983); *Volkswagen Interamericana, S.A. v. Rohlsen*, 360 F.2d 437, 441–42 (1st Cir.), *cert. denied*, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966). The same result obtains when the subsidiary is merely an empty shell. *See, e.g., Escude Cruz*, 619 F.2d at 905; *Wells Fargo*, 556 F.2d at 421.

*Donatelli*, 893 F.2d at 465–466.

The bulk of plaintiffs' alter-ego theory is based on the customary incidents of a parent-subsidiary relationship—ownership, common personnel, profits, and managerial oversight. These emblems are not suspect, and as federal case law makes clear, they are insufficient in and of themselves to permit the assertion of vicarious jurisdiction.[27] If they were, any foreign corporation that established an affiliate in the United States or purchased a controlling interest in an American corporation would subject itself to the jurisdiction of the courts of the United States. The case can be made that this should be so, but it is not the law, nor would such a result necessarily be desirable given the probability of claims of reciprocal jurisdiction by countries in which American corporations do business through subsidiaries of their own.

■ Plaintiffs' strongest agency argument rests on the allegation that Takeda (and Abbott) had the ultimate authority to approve TAP's marketing strategies. But a parent's oversight of a subsidiary's business plans is not ordinarily a sufficient "plus" to tip the jurisdictional scale. *See Kramer Motors, Inc. v. British Leyland, Ltd.*, 628 F.2d 1175, 1177–1178 (9th Cir. 1980) (British parent's approval of a marketing scheme developed by its United States subsidiary did not subject it to personal jurisdiction); *Alvarado Morales v. Digital Equipment Corp.*, 669 F.Supp. 1173, 1181 (D.P.R.1987) (a parent's authority to approve or reject the plans of a subsidiary does not establish parental domination); *Huang v. Sentinel Government Securities*, 657 F.Supp. 485, 490 (S.D.N.Y.1987) (foreign parent's approval of a subsidiary's entry into a new business did not subject the parent corporation to personal jurisdiction).

■ Illinois law tracks federal law in rejecting vicarious jurisdiction based merely on the parent-subsidiary relationship.[28]

---

**27.** The most significant fact counseling against an assertion of vicarious jurisdiction over Takeda (a fact which plaintiffs tend to gloss over), is that Takeda did not have a controlling interest in TAP, but shared ownership of TAP with Abbott. Joint ownership is almost ˙by definition inconsistent with the dominant control test that governs corporate veil-piercing under federal law.

**28.** Takeda maintains that with respect to the RICO claims, the court ultimately must apply a federal veil-piercing test. *See Pleasant Street I*, 960 F.2d at 1091 ("Under Massachusetts common law, disregarding the corporate form is permissible only in rare situations. . . .

It would, however, serve no useful purpose to explore the interstices of the state-law standard. This is, after all, a federal question case—and in federal question cases, courts are wary of allowing the corporate form to stymie legislative polices."). I do not, however, perceive any difference in the result under the facts of this case whether state or federal veil-piercing standards are to be applied, although I note that the federal standard as formulated by Judge Selya may in some respects be less friendly to Takeda than the various state tests I have considered. *See id.* at 1092.

"Parents of wholly-owned subsidiaries necessarily control, direct, and supervise subsidiaries to some extent. If, however, the subsidiary is conducting its own business, then an Illinois court may not assert *in personam* jurisdiction over the parent simply because it is the parent. Also, standing alone, the existence of common officers or directors serving both corporations is not sufficient to confer jurisdiction over a nonresident parent corporation." *Alderson v. Southern Co.*, 321 Ill.App.3d 832, 853, 254 Ill.Dec. 514, 747 N.E.2d 926, 944 (2001) (citations omitted). It is only when a subsidiary is acting as an agent of the parent corporation in the sense that the subsidiary is conducting the parent's business instead of its own that Illinois courts find the corporate veil subject to piercing. *See Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 102 Ill.2d 342, 352, 80 Ill. Dec. 765, 466 N.E.2d 217, 222 (1984). *See also IDS Life Insurance Co. v. SunAmerica Life Insurance Co.*, 136 F.3d 537, 540–541 (7th Cir.1998). In *Alderson*, jurisdiction was found over two parent holding companies that the court found to be "mere" umbrella corporations who carried out the entirety of their business through their captive subsidiaries. *Id.*, 321 Ill. App.3d at 855, 254 Ill.Dec. 514, 747 N.E.2d at 945. Similarly in *Maunder*, the parent company was found to have used a shell subsidiary to conduct business in Illinois. *Id.*, 102 Ill.2d at 352, 80 Ill.Dec. 765, 466 N.E.2d at 222. While there are some factual similarities in the relationship between Takeda and TAP, and the parents and subsidiaries discussed in *Alderson* and *Maunder*, plaintiffs' claim that TAP functioned solely under Takeda's thumb is belied by plaintiffs' concession that TAP is an independent corporation which "maintains its own employees and operations and conducts its affairs separately from Abbott and Takeda."[29] Amended Class Action Complaint ¶ 61. In sum, I do not believe that jurisdiction under the Illinois long-arm statute can properly be found under a corporate alter-ego or agency theory.

■ The second arrow in plaintiffs' jurisdictional quiver is the suggestion of a conspiracy. "It is now generally understood that the Illinois long-arm statute encompasses the conspiracy theory of jurisdiction."[30] *In re Vitamins Antitrust Litig.*, 94 F.Supp.2d 26, 33 (D.D.C.2000). "To plead successfully facts supporting application of the conspiracy theory of jurisdiction a plaintiff must allege both an actionable conspiracy and a substantial act in furtherance of the conspiracy performed in the forum state." *Textor v. Bd. of Regents of N. Ill. Univ.*, 711 F.2d 1387, 1392–1393 (7th Cir.1983). That Takeda, Abbott, TAP, and unnamed others conspired to violate the Prescription Drug Marketing Act, 21 U.S.C. §§ 331(t) and 333(b), might be inferred, as plaintiffs maintain, from generic references to "the defendants" and "they" in the description of the events that led to TAP's prosecution. *See* Amended Class Action Complaint at ¶¶ 81–89.[31] One

---

**29.** The concession is not surprising given plaintiffs' claim that Takeda and TAP conspired to illegally market Lupron®. If TAP were a true alter-ego of Takeda, Takeda could not be accused of conspiring with itself.

**30.** This may be something of an overstatement. The Illinois Supreme Court, in the words of one state Appellate Court, "has indicated some hesitancy in applying [the conspiracy theory of jurisdiction]." *Cleary v. Philip Morris, Inc.*, 312 Ill.App.3d 406, 409,

244 Ill.Dec. 795, 726 N.E.2d 770, 773 (2000). The *Cleary* Court nonetheless accepted the theory, indicating that it was bound to do so in light of the earlier panel decision in *Cameron, infra*, although with the faint endorsement that "at the present time, the theory has not been widely rejected by Illinois courts." *Id.* at 410, 244 Ill.Dec. 795, 726 N.E.2d at 773.

**31.** Count V of the Amended Class Action Complaint charges that defendants engaged in a RICO conspiracy in violation of 18 U.S.C.

can find Illinois cases that are very liberal in this regard, finding jurisdiction on the bare pleading of a conspiracy. *See Cameron v. Owens–Corning Fiberglas Corp.*, 296 Ill.App.3d 978, 986, 231 Ill.Dec. 55, 695 N.E.2d 572, 578 (1998) (distinguishing the level of pleading required to survive a motion to dismiss on a matter of substantive liability from the "bare allegations" sufficient to overcome a challenge to personal jurisdiction based on the suggestion of a conspiracy).

Whether the conspiracy theory of jurisdiction comports with federal due process requirements is another matter. *See Glaros v. Perse*, 628 F.2d 679, 682 n. 4 (1st Cir.1980) (implying that the First Circuit might not recognize the theory at all). As one academic commentator has observed:

[a]ny theory of jurisdiction derived from a state's statutory or common law must survive the test of fairness based on the defendant's contacts with the forum state. Thus, a court may not simply take the principle of state law that a co-conspirator acts as the agent of the other conspirators, plug it into the state's jurisdiction statute, and exercise whatever purported jurisdiction flows from that combination. The process of combining the two legal premises must itself survive due process scrutiny. Indeed, the attenuation involved in attributing one person's jurisdictional contacts to another should inspire increased vigilance.... The legal principle that co-conspirators act as each' other's agents when they act in furtherance of a conspiracy should not, by automatic operation of law, permit the attribution of one party's forum contacts to another. Rather, the particular facts of the relationship between the parties must support the conclusion that the non-resident

knew or should have known that by entering into the relationship he was exposing himself to the risk that he could be haled into court in the forum state.

Ann Althouse, *The Use of Conspiracy Theory to Establish In Personam Jurisdiction: A Due Process Analysis*, 52 Fordham L.Rev. 234, 252 (1983).

Assuming, however, that the conspiracy theory of jurisdiction could, in an appropriate factual context, pass federal constitutional scrutiny, due process requires more than a bare allegation of the existence of a conspiracy. *Cf. Kohler Co. v. Kohler International, Ltd.*, 196 F.Supp.2d 690, 697 (N.D.Ill.2002) (a plaintiff must allege specific facts warranting the inference that a defendant was a member of a conspiracy; naked allegations do not meet a plaintiff's jurisdictional burden). To hold otherwise, would permit a plaintiff who could not satisfy the common-law veil-piercing test to achieve the desired result by merely alleging that the foreign parent "conspired" with its domestic subsidiary. At a minimum, to satisfy due process, a plaintiff must plead the factual elements of an actionable conspiracy, that is, a criminal agreement and a substantial act committed in furtherance of the conspirators' unlawful purpose. While plaintiffs darkly observe that TAP is the contractual offspring of a joint undertaking between Takeda and Abbott, they offer no evidence to suggest that the agreement creating TAP encompassed anything of an unlawful nature. Nor have plaintiffs come forward with any evidence of a substantial (overt) act committed in Illinois by an alleged coconspirator (presumably TAP) in furtherance of any specific unlawful purpose. Plaintiffs in their brief refer only to ¶ 145 of the Amended Class Action Complaint where it

---

§ 1962(d). The Count, however, is framed in generic terms and alleges no factual predicate

for the conspiracy other than the facts incorporated from the body of the Complaint itself.

is said that "[d]efendants'[32] [Illinois] corporate headquarters communicated by United States mail and by fax with various local District Managers and pharmaceutical representatives, including the six individuals currently under Indictment, in furtherance of the Defendants' schemes." An allegation of an overt act (or acts) on this order of generality, which fails to specify the content of any of these communications or to make any connection between the communications and Takeda or any connection with any conspiratorial compact, fails to satisfy even the most liberal of pleading requirements, much less meet the plaintiffs' evidentiary burden of showing jurisdiction. *See Glaros*, 628 F.2d at 682 ("[Plaintiff's] allegations of conspiracy were purely conclusory and did not specifically link the out-of-state ... defendants to acts committed within Massachusetts."); *In re Vitamins Antitrust Litig.*, 94 F.Supp.2d at 33 (allegations of a worldwide "per se" unlawful conspiracy resulting in the commission of "unlawful acts in furtherance of [defendants'] unlawful combination" were insufficiently detailed to establish Illinois conspiracy jurisdiction over nonresident corporations); *American Land Program, Inc. v. Bonaventura Uitgevers Maatschappij*, 710 F.2d 1449, 1454 (10th Cir.1983) ("Mere allegations of conspiracy, without some sort of prima facie showing of a conspiracy, cannot be the basis of personal jurisdiction of co-conspirators outside the territorial limits of the court.").

Plaintiffs' third jurisdictional arrow has a surer aim. The Illinois long-arm statute will support a claim of general jurisdiction where the "doing business" test of § 209(b)(4) is satisfied.

According to the doing business doctrine, once an unlicensed foreign corporation is found to be doing business in Illinois, the corporation is amenable to suits in the state, even though they may not arise from the corporation's business in the Illinois forum. *Asset Allocation & Management Co.*, 892 F.2d at 570. The rationale is that a nonresident corporation which conducts business in Illinois purposely avails itself of the jurisdiction and laws of Illinois, and therefore, is considered to have consented to be sued in Illinois courts. *Cook Assocs., Inc.*, 57 Ill.Dec. 730, 429 N.E.2d at 851. There is no all-inclusive test for determining whether a non-resident corporation is doing business in Illinois. *Id.* at 852. Instead, the facts unique to each case are determinative. *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 102 Ill.2d 342, 80 Ill.Dec. 765, 769, 466 N.E.2d 217, 221 (1984). Nevertheless, it is well established that in order to impose jurisdiction the non-resident corporation's contacts must be "continuous, permanent, ongoing and systematic ... not occasional or casual." *Reeves v. Baltimore & O R.R.*, 171 Ill.App.3d 1021, 122 Ill.Dec. 145, 148, 526 N.E.2d 404, 407 (1988); *Asset Allocation*, 892 F.2d at 570.

*Milligan v. Soo Line Railroad Co.*, 775 F.Supp. 277, 279 (N.D.Ill.1991).[33]

**32.** Although in the possessive plural, in context this reference is clearly to TAP and not to TAP and Takeda.

**33.** The historical evolution of the doing business test in Illinois is set out at length by the Illinois Supreme Court in *Cook Assocs., Inc. v. Lexington United Corp.*, 87 Ill.2d 190, 197–202, 57 Ill.Dec. 730, 429 N.E.2d 847, 851–853

(1981). The examples the Court gives of the application of the test includes findings of jurisdiction over a railroad with no Illinois trackage, but with an office and employees engaged in the solicitation of business in Illinois, *see St. Louis–San Francisco Ry. Co. v. Gitchoff*, 68 Ill.2d 38, 11 Ill.Dec. 598, 369 N.E.2d 52 (1977), and over a manufacturer that maintained a sales and service relation-

■ To satisfy the doing business test, a defendant must be shown to have done more than simply solicit business in Illinois. *Cook Associates, Inc.*, 87 Ill.2d at 201, 57 Ill.Dec. 730, 429 N.E.2d at 852. "Solicitation plus sales or supervisory control over distributors may be sufficient, however.... Similarly, if a defendant's products regularly enter Illinois in a substantial amount, jurisdiction may be justified." *Japax, Inc. v. Sodick Co. Ltd.*, 186 Ill.App.3d 656, 661, 134 Ill.Dec. 446, 542 N.E.2d 792, 795 (1989). According to plaintiffs, Takeda

> regularly and systematically ships substantial quantities of pharmaceutical and vitamins products into [Illinois] for processing and sale by its Illinois-based affiliates, [d]efendant TAP (in the case of pharmaceutical products) and TPNA. In that regard, Takeda routinely and systematically initiates and receives communications to and from Illinois, causes products to be shipped into Illinois for resale to Illinois consumers and others, [and] has entered into non-sporadic licensing and marketing agreements with affiliated and unaffiliated Illinois businesses.

Opposition to Takeda's Motion to Dismiss, at 33.[34]

The *Japax* case is instructive. Despite the fact that Sodick, Japax's competitor, had no offices, telephones, property, employees, or agents in Illinois, and made no direct sales to Illinois consumers, the Illinois Appellate Court concluded

> that Sodick Japan's EDM systems do not find their way into Illinois by hap-

penstance, on an occasional basis. The circumstances under which Sodick Japan's products come into this State are part of a plan to sell regularly in Illinois, even if the products leaving the Japanese plant are initially sold, in Japan, to intermediaries who sell in the United States.... Sodick USA, despite being set up as a separate corporate entity, functions as the service arm of Sodick Japan, maintaining the EDM systems in Illinois and other states. Evidence of record indicates that Sodick Japan maintains some control over its subsidiary, or at least maintains significant connections with it in order to facilitate the sales and servicing of its systems. For example, Sodick Japan has 'loaned' employees to Sodick USA, accounting for a significant portion of USA's personnel, including its president. Many or most of Sodick USA's officers and members of the board of directors have come from Sodick Japan. Sodick Japan has loaned or guaranteed millions of dollars on behalf of its subsidiary. Employees of Sodick Japan come to the United States, including Illinois, to train Sodick USA personnel, to assist in Sodick USA's service activities and to attend trace shows. Some visit and inspect the premises of Sodick's Illinois distributor. The two companies regularly communicate and Sodick USA's officers apparently report to Sodick Japan's executive managing director.

186 Ill.App.3d at 664–665, 134 Ill.Dec. 446, 542 N.E.2d at 796–797. On these facts, which closely parallel those establishing

---

ship with an Illinois distributor of its products, *see Braband v. Beech Aircraft Corp.*, 72 Ill.2d 548, 21 Ill.Dec. 888, 382 N.E.2d 252 (1978).

**34.** Many of plaintiffs' jurisdictional facts are presented in the negative, *e.g.*, "Takeda cannot credibly and does not deny," "Takeda

does not even attempt to argue," and so on, reflecting perhaps a misapprehension on plaintiffs' part regarding the allocation of the burden of proof. Nonetheless, Takeda does not deny the core allegation that through product sales and the activities of its subsidiaries, it has a presence in the Illinois market.

Takeda's presence in Illinois, as projected through TAP, TPNA, and TPA, the Illinois Appellate Court felt it unnecessary to address the issue of whether Sodick USA was an alter-ego of Sodick Japan. "[W]e believe that the record contains enough links between the two companies to impute Sodick USA's marketing and servicing activities in Illinois to its parent corporation." 186 Ill.App.3d at 665, 134 Ill.Dec. 446, 542 N.E.2d at 797. *See also Liberty Mutual Fire Ins. Co. v. Reimer Express Enterprises. Ltd.*, 82 F.Supp.2d 887, 890 (N.D.Ill.2000) (finding the *Japax* factors satisfied where non-resident defendants seconded employees to an Illinois subsidiary, loaned it money, gave it business advice, informally approved its business plans, and owned 80% of its stock).

That a finding of jurisdiction based on the volume of a non-resident's sales of goods within the forum will satisfy the Illinois Constitution does not, of course, answer the question of whether such a finding comports with federal due process. In *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), Justice O'Connor, writing for three other Justices, held that "the placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State," and would therefore not be sufficient in and of itself to support a finding of *specific* jurisdiction. However, "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id.*[35] Acknowledging *Asahi*, the *Japax* court distinguished the case in terms that I find persuasive.[36] "Unlike the Japanese defendant in [*Asahi*], Sodick Japan had more than mere knowledge that its products likely would end up in Illinois. The distribution scheme and advertising for its EDM systems, along with its control over the activities of Sodick USA make it reasonable for this defendant to be subject to the Illinois courts' jurisdiction." *Japax*, 186 Ill. App.3d at 665–666, 134 Ill.Dec. 446, 542 N.E.2d at 798. *Compare Asahi Metal*, 480 U.S. at 112–113, 107 S.Ct. 1026 (no evidence that Asahi created, controlled or employed the distribution system that brought its tire tube valves to California).

*Due Process*

While I am persuaded that under a "stream of commerce plus" theory, Takeda's contacts with Illinois are sufficient to demonstrate its "purposeful availment" of the Illinois forum, the Due Process Clause nonetheless forbids the exercise of personal jurisdiction under circumstances that would offend "traditional notions of fair play and substantial justice." *Internation-*

**35.** Justice Brennan, writing for the other half of the divided Court, took the position that jurisdiction should attach when "the regular and anticipated flow of products," rather than "unpredictable currents or eddies," introduces a defendant's goods into the forum. *Asahi Metal*, 480 U.S. at 117, 107 S.Ct. 1026. Obviously, if a defendant is subject to jurisdiction under the test articulated by Justice O'Connor, it is also subject to jurisdiction under the more liberal test espoused by Jus-

tice Brennan. *See Pennzoil Products Co. v. Colelli & Assocs., Inc.*, 149 F.3d 197, 207 n. 11 (3d Cir.1998).

**36.** Although *Asahi* is a specific jurisdiction case, the *Japax* Court proceeded on the assumption that its discussion of the "stream of commerce" theory would apply equally to a claim of general jurisdiction under Illinois law.

*al Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). These "reasonableness" considerations (termed the "Gestalt" factors) include: "the plaintiffs' interest in obtaining convenient and effective relief; the burden imposed upon the defendant by requiring it to appear; the forum's adjudicatory interest; the interstate judicial system's interest in the place of adjudication; and the common interest of all affected sovereigns, state and federal, in promoting substantive social policies." *Donatelli,* 893 F.2d at 465, citing *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174.

The Illinois plaintiffs' interest in obtaining relief is self-evident and their choice of Illinois as a forum is entitled to deference. *Hyatt International Corp. v. Coco,* 302 F.3d 707, 718 (7th Cir.2002). As to Takeda as a defendant, "the concept of burden is inherently relative, and, ... is only meaningful where a party can demonstrate some kind of special or unusual burden." *Pritzker,* 42 F.3d at 64. In Takeda's case, there is no burden at all, given the flow of Takeda personnel to and from Illinois in connection with its Illinois-based hub of operations. Takeda is not only an international corporation with an insider's knowledge of the United States, it is also a sophisticated consumer of American legal services, having appeared as both plaintiff and defendant in criminal and civil cases in federal and state courts. Finally, the adjudicatory interest in redressing allegations of fraud and the conduct of a criminal enterprise, and the social importance of such redress to the State of Illinois, is compelling.[37] In sum, I see nothing in an assertion of jurisdiction over Takeda under § 209(b)(4) of the Illinois long-arm statute that would offend due process.

*Massachusetts Jurisdiction*

■■■■■ Plaintiffs argue that the Massachusetts long-arm statute confers specific jurisdiction over Takeda "by virtue of the extensive activities, criminal and otherwise, of [d]efendant TAP in Massachusetts, and by virtue of Takeda's extensive relationship with and control over TAP."[38] Opposition to Takeda's Motion to Dismiss, at 42. What is missing from the Complaint and the plaintiffs' evidentiary showing is any suggestion that Takeda itself "operates" within Massachusetts, or has "attempted to participate in the Commonwealth's economic life." *Pleasant Street I,* 960 F.2d at 1087. The fact that Takeda indirectly derives revenue from TAP's sales in Massachusetts is not determinative, nor is the fact that Takeda has a parental relationship with TAP. Like Illinois, Massachusetts respects the corporate form. *See Spaneas v. Travelers Indemnity Co.,* 423 Mass. 352, 354, 668 N.E.2d 325 (1996) ("Only in rare instances, in order to prevent gross inequity, will a Massachusetts court look beyond the corporate form."). Even where a non-resident parent owns the controlling share of a subsidiary doing business in Massachusetts, personal jurisdiction does not exist unless the stringent Massachusetts veil-piercing test is satisfied. *See My Bread Baking Co. v. Cumberland Farms, Inc.,* 353 Mass. 614, 618–19, 233 N.E.2d 748 (1968). Consistent with the federal standard, Massachusetts courts have found jurisdiction over a non-resident parent only where the parent has

---

**37.** The remaining factor, the interstate judicial system's interest in the place of adjudication, does not weigh in the equation, as the ultimate choice of a forum depends on a complex interaction of state and federal sovereignty, statute, and decisional law. *See Lexecon, Inc. v. Milberg Weiss Bershad Hynes &* *Lerach,* 523 U.S. 26, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998).

**38.** The *Porter, Beacon, Maczak, Mechanical Contractors,* and *Blues* actions were filed in Massachusetts.

ignored the corporate independence of the subsidiary by using the subsidiary as a sham proxy to conduct its own business. *See Kleinerman v. Morse*, 26 Mass.App.Ct. 819, 823, 533 N.E.2d 221 (1989). As plaintiffs' evidentiary showing with respect to Takeda's direct conduct in Massachusetts is even less developed than it is with respect to Illinois, there can be no claim of jurisdiction under the corporate alter-ego doctrine.[39]

◼ Plaintiffs alternatively argue that Massachusetts would permit an exercise of general jurisdiction over Takeda because "Takeda derives substantial benefit and revenue from its operations in the state." [40] Opposition to Takeda's Motion to Dismiss, at 41. Plaintiffs anchor this argument on M.G.L. c. 223A, § 3(d), which permits a Massachusetts court to assert jurisdiction over a non-resident defendant who directly or through an agent "caus[es] tortious injury in this commonwealth by an act or omission outside this commonwealth if he ... derives substantial revenue from goods used or consumed or services rendered, in this commonwealth." According to plaintiffs, "several of Takeda's affiliates, including defendant TAP and Takeda North America, conduct substantial business in Massachusetts. As the head of the global 'Takeda Group' of companies, Takeda derives and reports these revenues and profits as its own." [41] Opposition to Takeda's Motion to Dismiss, at 41–42. The principal case upon which plaintiffs rely is *Heins v. Wilhelm Loh Wetzlar Optical*

*Machinery GmbH & Co. KG.*, 26 Mass. App.Ct. 14, 522 N.E.2d 989 (1988), a products liability case in which an injured plaintiff was permitted to proceed against a German manufacturer who sold an allegedly defective lens grinding machine in Massachusetts through a Swiss company's Illinois subsidiary. While finding (curiously) that jurisdiction could not be asserted under the transacting business test of M.G.L. c. 223A, § 3(a), the Appeals Court held that *specific* jurisdiction arose under the § 3(d) substantial revenue test despite the fact that the revenues had been remitted through two intervening corporations in which the German company had no ownership interest. As the Court pointed out, employees of the defendant regularly paid visits over a seven year period to customers in Massachusetts to advise on installed machines and to solicit additional sales. *Id.* at 19–20, 522 N.E.2d 989.

> While the sales of the defendant's products may have been accomplished indirectly, the defendant also acted directly to serve the Massachusetts market. The defendant sent its employees to Massachusetts to visit existing or prospective customers at three different companies to provide advice on delivered machines and to cultivate a market for the defendant's products. The defendant derived substantial revenue from its products used in Massachusetts. *Cf. World–Wide Volkswagen v. Woodson*, 444 U.S. at 299, 100 S.Ct. at 568. When

---

**39.** As Takeda argues, Massachusetts does not recognize a conspiracy theory of jurisdiction. Plaintiffs do not contend otherwise.

**40.** Takeda maintains that Massachusetts does not recognize the theory of general jurisdiction. I believe this to be wrong. *See Noonan v. Winston Co.*, 135 F.3d 85, 92–93 (1st Cir. 1998) (discussing whether defendants' "contacts with Massachusetts were sufficiently continuous and systematic to permit the dis-

trict court to exercise general jurisdiction."); *Connecticut National Bank v. Hoover Treated Wood Products, Inc.*, 37 Mass.App.Ct. 231, 233–234 n. 6, 638 N.E.2d 942 (1994) ("General Laws c. 223A, § 3(d), is predicated on general jurisdiction.").

**41.** Takeda does not deny that it derives substantial revenues, albeit indirectly, from TAP's activities in Massachusetts.

considered cumulatively, we think these facts support a finding of sufficient minimum contacts brought about by the purposeful acts of the defendant directed toward Massachusetts, so that the assertion of specific personal jurisdiction over the defendant by the Superior Court is consonant with due process.

*Id.* at 25, 522 N.E.2d 989.

Assuming that *Heins* is correctly decided (the Appeals Court seems to have confused specific and general jurisdiction in its analysis of § 3(d)), and assuming that plaintiffs have sufficiently pled a tort, *see Kleinerman*, 26 Mass.App.Ct. at 823–824, 533 N.E.2d 221 (misrepresentation), plaintiffs have failed to offer any facts showing that Takeda, as opposed to TAP, actively inserted itself as an actor in the Massachusetts market in the same fashion as did the German defendant in *Heins*.[42] In other words, plaintiffs' general jurisdiction argument with regard to Takeda is simply a recycling of the theory that Takeda can be held vicariously liable for the conduct of TAP.[43]

### Alabama Jurisdiction

In identical fashion, plaintiffs rely exclusively on TAP's activities to establish personal jurisdiction over Takeda in Alabama.[44] Opposition to Takeda Motion to Dismiss, at 46. Like Massachusetts, Alabama's long-arm statute provides for jurisdiction over a non-resident defendant when, because of its own acts or those of an agent, tortious injury or damages result to an Alabama plaintiff. *See* Ala. R. Civ. P. 4.2(a)(2). Alabama is, however, no less respectful of the corporate form than are its sister states. *See Ex parte Volkswagenwerk Aktiengesellschaft*, 443 So.2d 880, 884 (Ala.1983) (explaining Alabama's "control and domination" test). Other than an unrelated settlement reached between TAP and the Alabama Attorney General regarding billings to the Alabama Medicaid program, *see* Amended Class Complaint ¶ 40, plaintiffs have made no effort to identify any activity by Takeda in Alabama that is separate from the conduct of TAP.

### Minnesota Jurisdiction

Plaintiffs' penultimate target is Minnesota.[45] Plaintiffs assert three bases for jurisdiction under Minnesota law: (1) that "TAP and other subsidiaries that Takeda owns and controls conduct business in the state;" (2) that Takeda conspired with TAP in Minnesota; and (3) that Takeda has submitted itself to Minnesota jurisdiction by participating without objection in (unrelated) litigation in the Minnesota federal court. As is the case with Illinois, Minne-

---

**42.** The holding of *Commonwealth v. Philip Morris, Inc.*, 1998 WL 1181992, at *6 (Mass.Super.Mar. 20, 1998), the second case upon which plaintiffs rely, is to the same effect. As then Superior Court judge and now Supreme Judicial Court Justice Sosman pointed out, the British parent corporation over whom she found jurisdiction could not be held liable for the acts of its subsidiaries in Massachusetts but only "for what it itself has allegedly done," that is, expressly instructing its American subsidiaries to disseminate in Massachusetts and elsewhere false information on the health dangers posed by cigarette smoking.

**43.** While Massachusetts provides an alternative statutory basis for asserting jurisdiction over a foreign corporation through its "soliciting business" statute, M.G.L. c. 223, § 38, Takeda correctly points out that the statute confers jurisdiction only when a defendant is served personally in the Commonwealth. *LTX Corp. v. Daewoo Corp.*, 979 F.Supp. 51, 56–57 (D.Mass.1997).

**44.** The *Brickey* action was initially filed in Alabama.

**45.** The *Twin Cities* action was initially filed in Minnesota.

sota's long-arm statute reaches broadly.[46]

The first argument suffers from a familiar defect. Plaintiffs have failed to show that Takeda's control over TAP is so pervasive as to permit TAP's conduct to be imputed to Takeda. Plaintiffs rely principally on an unpublished decision, *Pecarina v. Tokai*, 2002 WL 1023153 (D.Minn. May 20, 2002). In *Pecarina*, the district court found jurisdiction over Tokai, a Japanese company, based on the sale by a subsidiary of a defective lighter manufactured in Japan by Tokai. "Tokai supplied the lighters to Scripto for distribution.... Tokai was the head of a distribution network, controlling the network to deliver Tokai's products into the stream of commerce." *Id.* at *3. Like many jurisdictions, Minnesota recognizes a stream of commerce theory of jurisdiction in personal injury products liability cases. *Guinness Import Company v. Mark VII Distributors, Inc.*, 971 F.Supp. 401, 409 (D.Minn.1997) ("Courts typically do not extend the stream of commerce theory beyond the products liability context or beyond a dispute pertaining to the actual product."); *Welsh v. Takekawa Iron Works Co., Ltd.*, 529 N.W.2d 471, 473–474 (Minn.App.1995) ("In products liability cases, however, a plaintiff can rely on a foreign corporation's indirect contacts with a state under the 'stream-of-commerce' theory."); *Helten v. Arthur J. Evers Corp.*, 372 N.W.2d 380, 382 (Minn.App. 1985) (personal jurisdiction may exist in a products liability case despite a defendant's lack of direct contacts with Minnesota). There is no allegation in this case that there was anything defective about Lupron® as a drug, or that Lupron® caused any physical injury to a citizen of Minnesota. Rather the claim is that defendants rigged a scheme to inflate Lupron®'s price.

The conspiracy theory of jurisdiction is embraced by Minnesota so long as the "traditional tests" of a conspiracy are satisfied and an overt act in furtherance of the conspiracy can be shown to have taken place in Minnesota. *See In re Cardizem CD Antitrust Litigation*, 105 F.Supp.2d 618, 673–674 (E.D.Mich.2000); *Aeration Industries, Inc. v. Aqua–Aerobic Systems, Inc.*, 1987 WL 6841, at *4 (D.Minn. Feb. 20, 1987); *West Virginia v. Morton Int'l, Inc.*, 264 F.Supp. 689, 692–697 (D.Minn. 1967); *Hunt v. Nevada State Bank*, 285 Minn. 77, 105, 172 N.W.2d 292, 312 (1969). Plaintiffs cite no evidence of a criminal agreement between Takeda and TAP and no evidence of an overt act other than two memoranda sent by a TAP executive describing an initiative underway in Minnesota to bring Lupron® (among other

---

**46.** Minn.Stat. § 543.19. (personal jurisdiction over nonresidents) reads in its entirety:

Subdivision 1. As to a cause of action arising from any acts enumerated in this subdivision, a court of this state with jurisdiction of the subject matter may exercise personal jurisdiction over any foreign corporation or any nonresident individual, or the individual's personal representative, in the same manner as if it were a domestic corporation or the individual were a resident of this state. This section applies if, in person or through an agent, the foreign corporation or non-resident individual:

(a) Owns, uses, or possesses any real or personal property situated in this state, or

(b) Transacts any business within the state, or

(c) Commits any act in Minnesota causing injury or property damage, or

(d) Commits any act outside Minnesota causing injury or property damage in Minnesota, subject to the following exceptions when no jurisdiction shall be found:

(1) Minnesota has no substantial interest in providing a forum; or

(2) the burden placed on the defendant by being brought under the state's jurisdiction would violate fairness and substantial justice; or

(3) the cause of action lies in defamation or privacy.

drugs) under the LCA reimbursement formula.[47]

Plaintiffs' final argument is that jurisdiction in Minnesota is proper because Takeda is currently involved in patent litigation (unrelated to Lupron®) in a Minnesota federal court. This would be a fair consideration in an assessment of the "Gestalt" factors, but the appearance of a party in one lawsuit is not an implied waiver of the right to object to jurisdiction in another unrelated case. *See General Contracting & Trading Co. v. Interpole, Inc.,* 940 F.2d 20, 22–23 (1st Cir.1991). *Cf. Nationwide Engineering & Control Systems, Inc. v. Thomas,* 837 F.2d 345, 347–348 (8th Cir. 1988) (a removal from state to federal court does not waive the right to object to a lack of personal jurisdiction).

*Federal Long–Arm Jurisdiction*

Plaintiffs alternatively argue that if jurisdiction over Takeda does not exist under any of the four asserted state long-arm statutes, it is nonetheless proper under Fed.R.Civ.P. 4(k)(2) (the federal long-arm statute). The Rule, enacted in 1993, was intended to fill the jurisdictional gap that arises when a defendant's aggregate contacts with the United States are of a sufficient intensity to satisfy due process, but are insufficiently focused on any one state so as to create jurisdiction under state

law.[48] *Cf. Asahi Metal,* 480 U.S. at 113, 107 S.Ct. 1026.

The personal jurisdiction inquiry in federal question cases like this one differs from the inquiry in diversity cases. *See* 28 U.S.C. § 1332. Here, "the constitutional limits of the court's personal jurisdiction are fixed ... not by the Fourteenth Amendment but by the Due Process Clause of the Fifth Amendment." *United Elec., Radio & Mach. Workers v. 163 Pleasant St. Corp.,* 960 F.2d 1080, 1085 (1st Cir.1992) (*Pleasant St. I*). This distinction matters because under the Fifth Amendment, a plaintiff need only show that the defendant has adequate contacts with the United States as a whole, rather than with a particular state.

*Swiss Bank II,* 274 F.3d at 618.

Rule 4(k)(2), however, permits the assertion of federal long-arm jurisdiction only when the underlying claims arise under federal law and a foreign defendant "is not subject to the jurisdiction of the courts of general jurisdiction of *any* state." (Emphasis added). The Rule requires plaintiffs to certify that to their knowledge, based on information that is "readily available," Takeda is not subject to the jurisdiction of any state court.[49] *Swiss Bank I,*

47. It seems that the memoranda were written in Illinois and transmitted to Takeda from Illinois, not Minnesota.

48. Apart from the volume of Takeda's sales and the gross revenue it derives from customers in the United States, plaintiffs suggest that federal long-arm jurisdiction is appropriate because: (1) senior Takeda executives have regularly attended TAP's national and regional sales meetings; (2) on two occasions Takeda personnel accompanied TAP sales representatives on local marketing calls; (3) Takeda at least twice convened meetings with TAP Directors in the United States; (4) TAP's national sales meetings in 1994 and 1999 were held in Osaka, Japan, under Takeda

auspices; (5) Takeda has sought to develop new products through research and development agreements with United States partners and has licenced its technology to United States companies (plaintiffs count at least five such agreements); (6) Takeda has publicly boasted of its "significant presence" in the American market; (7) Takeda has previously been found in violation of federal antitrust laws (the "Vitamins Litigation"); (8) and, finally, Takeda has vigorously defended its intellectual property rights in the courts of the United States.

49. If plaintiffs were to certify the unavailability of any state forum, the burden would then shift to Takeda to show either that it could be

191 F.3d at 41. This they have not done. Instead, they have attempted to shift the burden to Takeda by arguing that if Takeda is successful in defeating jurisdiction under the laws of Illinois, Massachusetts, Alabama, and Minnesota, "then it is difficult to imagine any state in which Plaintiffs can establish, or in which Takeda will concede, *in personam* jurisdiction." Opposition to Takeda's Motion to Dismiss, at 47. The argument is not a substitute for the requirements of *Swiss Bank I,* and in any event, is beside the point, as I find that Takeda is subject to personal jurisdiction under Illinois law.

### ORDER

For the foregoing reasons, Takeda's motion to dismiss for want of personal jurisdiction is *DENIED* as to *Goetting* and *Russano* (Illinois). The motion is *ALLOWED* as to *Porter, Beacon,* and the *Blues* (Massachusetts); *Brickey* (Alabama); and *Twin Cities* (Minnesota). The following actions are *DISMISSED* for want of prosecution: *Townsend* (Illinois);[50] *Maczak* and *Mechanical Contractors* (Massachusetts).

SO ORDERED.

### MEMORANDUM AND ORDER ON DEFENDANT TAKEDA'S MOTION TO RECONSIDER

Takeda's motion to reconsider is well presented, but unpersuasive. Wishful thinking and strained distinctions cannot make the *Japax* case go away. The *Japax* court was willing to assume that Sodick USA (Sodick's Illinois affiliate) was sufficiently independent of its parent to be accorded corporate respect. But as the court continued

> [w]hile we need not determine whether Sodick USA is the alter ego of Sodick Japan for all purposes, we believe that the record contains enough links between the two companies to impute Sodick USA's marketing and servicing activities in Illinois to its parent corporation. (*Cf. People v. Parsons Co.* (1984), 122 Ill.App.3d 590, 597–98, 78 Ill.Dec. 74, 80–81, 461 N.E.2d 658, 664–65.) To find otherwise would allow foreign corporations to purposefully exploit local markets and reap the benefits and advantages of doing business directly while insulating themselves from lawsuits by using "separate" subsidiaries and distribution networks to implement their business activity. *See Maunder v. DeHavilland Aircraft of Canada* (1983), 112 Ill. App.3d 879, 883, 68 Ill.Dec. 450, 453, 445 N.E.2d 1303, 1306, *aff'd* (1984), 102 Ill.2d 342, 80 Ill.Dec. 765, 466 N.E.2d 217 ("The fact that [defendant's] sales were conducted indirectly through a third party does not excuse [it] from the jurisdiction of Illinois courts.").

*Japax, Inc. v. Sodick Co. Ltd.,* 186 Ill. App.3d 656, 665, 134 Ill.Dec. 446, 542 N.E.2d 792, 797 (1989).[1]

It is true, as Takeda argues, that the *Japax* court adapted the specific jurisdiction "stream of commerce plus" theory set out in *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62

---

subject to suit in one or more of the States or that its contacts with the United States are insufficient as a matter of law to subject it to federal jurisdiction. *Swiss Bank I,* 191 F.3d at 41.

**50.** While the *Townsend* action was brought in Illinois, Townsend is not named as a plaintiff in the Amended Class Action Complaint.

**1.** I simply do not understand Takeda's suggestion that the *Japax* court found that Sodick USA was a "mere service arm" of Sodick Japan. The *Japax* court made it abundantly clear that whether or not Sodick USA was an "alter-ego" of its corporate parent had no relevance to its decision.

L.Ed.2d 490 (1980), and *Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), to the Illinois doing business test. "Here, Sodick Japan certainly appears to have targeted Illinois as a State in which it intended for its products to be sold, advertised, and serviced. Unlike the Japanese defendant in [*Asahi Metal*], Sodick Japan had more than mere knowledge that its products would likely end up in Illinois. The distribution scheme and advertising for its EDM systems, along with its control over the activities of Sodick USA makes it reasonable for this defendant to the subject to the Illinois courts' jurisdiction." *Id.,* 186 Ill.App.3d at 666, 134 Ill.Dec. 446, 542 N.E.2d at 798. I must assume that the *Japax* court was as aware as I am that *Volkswagen* and *Asahi Metal* are specific jurisdiction cases. But like the *Japax* court, I am not persuaded that this makes any difference.[2] In *Asahi Metal,* the Supreme Court was clearly of the view that in a modern economy, jurisdiction can properly be asserted on a stream of commerce basis alone. Indeed, half of the Court, led by Justice Brennan, would have permitted jurisdiction on the mere foreseeability of a product's arrival in the forum state. The ultimate finding of an absence of jurisdiction in *Asahi Metal* turned on fairness factors, rather than on the ab-

sence of contact with the forum state.[3] Takeda does not argue that like the Japanese defendant in *Asahi Metal,* it did not purposefully direct its products towards Illinois. Takeda has never disputed that it has a major and longstanding presence in the Illinois market, deliberately targets sales of pharmaceutical and vitamins products at Illinois, and through its affiliates uses Illinois as a base of operations for the sales of its products in the United States as a whole.[4] *See Provident National Bank v. California Fed. Savings & Loan Ass'n,* 819 F.2d 434, 438 (3d Cir.1987) (finding the general jurisdiction test satisfied where defendant's contacts with the forum were "central to the conduct of its business").

It is true that general jurisdiction as a doctrine has received little by way of elucidation from the Supreme Court, the doctrine having figured in only three cases, *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952), and *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).[5] *See* Kristina L. Angus, *The Demise of General Jurisdiction: Why the Supreme Court Must Define the Parameters of General*

**2.** While it is true, as Takeda points out, that any number of federal courts have refused to apply the "stream of commerce" theory as a test for general jurisdiction, the test applied by the *Japax* court relied on the "plus" factors identified by Justice O'Connor, and not merely a flow of goods into the forum state. The First Circuit, among others, has approved the consideration of the volume of a defendant's sales in the forum in assessing the existence of general jurisdiction. *See Noonan v. The Winston Co.,* 135 F.3d 85, 93 n. 8 (1st Cir. 1998).

**3.** As explained in the Memorandum and Order of January 24, 2003, at pp. 27–28, the

fairness factors are easily satisfied in Takeda's case.

**4.** Takeda did not, as it claims, simply place its products in a free flowing "stream of commerce" with Illinois as an incidental destination. It shipped them directly to Illinois for distribution in Illinois and elsewhere in the United States. Nor did the court "implicitly" find that Takeda had purposefully established sufficient contacts with Illinois. It explicitly found so.

**5.** *Helicopteros* was the first Supreme Court case to adopt the distinguishing terms "specific" and "general" jurisdiction.

*Jurisdiction,* 36 Suffolk U.L.Rev. 63 (2002) (arguing that the Court has regrettably neglected general jurisdiction while expanding the role of specific jurisdiction as the principal protection of state residents doing business with nonresident defendants). What is, however, clear from this handful of cases is that general jurisdiction is a "substantial contacts and continuity" test focusing on the quality (or in some cases, the quantity) and duration of a defendant's contacts with the forum in which jurisdiction is asserted. *See, e.g., International Shoe,* 326 U.S. at 318, 66 S.Ct. 154. Illinois's understanding of the test is no different. "[T]he Illinois courts ... insist that the business done by the defendant in Illinois be intentional, substantial, and continuous rather than inadvertent, trivial, or sporadic, that it continue up to the time of suit, and that it evidence a purpose on the part of the defendant to avail [it]self of the protection of the laws of Illinois." *Asset Allocation and Management Co. v. Western Employers Ins. Co.,* 892 F.2d 566, 570 (7th Cir.1989). *See also Publications International, Ltd. v. Burke/Triolo, Inc.,* 121 F.Supp.2d 1178, 1182–1183 (N.D.Ill.2000) (finding an assertion of general jurisdiction proper where the defendant California company maintained an interactive website in Illinois soliciting orders for its sales catalogue). Because I am confident that the Illinois courts would find Takeda's commercial presence in Illinois to be both sustained and substantial, I remain convinced that the Illinois doing business test has been satisfied.

### ORDER

For the foregoing reasons, Takeda's motion to reconsider is *DENIED.*

SO ORDERED.